Good morning, Your Honours. My name is Abbas Kazrounian and I'm here to represent the Appellant Eric Knutson in this matter. There are two issues before the Court today. The first of which is, was there a validly formed contract between the Appellant Eric Knutson and the Respondent Sirius Radio? Could you tell me just a minimal amount about what the underlying claim is here? Absolutely, Your Honour. The underlying claim is a TCPA class action where the class representative is Eric Knutson. And he brought actions for violations of the Telephone Consumer Protection Act. For what? I'm sorry? The Telephone Consumer Protection Act. Well, I know all that, but I want to know what it's about. What were these telephone calls, were they related to the contract? Were they just random phone calls from Sirius? Well, I think there's two questions there, Your Honour, and I think that they're valid ones. But the first one is, are they related to the contract? And the Appellant's contention is that... What happened here? You know, I have no idea what all this equipment is for, except you get 700 radio stations. Yes, Your Honour. Yeah, but why does anybody want 700 radio stations? And so he goes and buys this truck, right? Yes, Your Honour. And so what is this Sirius XM satellite radio? Is that a piece of equipment that's in there? Is that what they call a radio? What is it?  So he didn't buy the radio. He already bought the radio. It's part of the car, yes. He went to buy a car. He buys a car and it's got a radio. Yes, Your Honour. And I think you raise a very good point. I think this is a very fact-intensive case. And before I can answer Judge Berzon's questions, I think it's really important to go through the facts like you've laid out, Judge. So when does he find out he can get 700 or 800 stations? On day one, he goes to the dealership. How does he find out about it? Who told him about it? The salesman. The salesman. The salesman. He picked his car. He negotiated the price for the car. He signed his 12-foot yellow contract that we all signed. All these other fancy forms. And then the salesman comes in and says, hey, let me show you all the bells and whistles on this car. You've got the power steering. You've got the ABS brakes. And by the way, I've activated a free 90-day XM radio for you as part of the bells and whistles that you're going to get with the vehicle. So what does he think? He's getting a new radio? No. Did he know what XM radio was? I don't presume he knew what it was. I'm pretty sure he knew, but I can't definitively tell you. But let's just say he did know what it was. So he said, okay, that's an extra feature that Toyota is offering. Thank you very much. So he's happy. And at that point, he gets in the car and he drives off the lot. And I think it's really important to look at that very specific frame in time and see what was going on legally at that particular point. Was there a contract? And if so, who were the parties to that contract? Was Sirius Radio involved in any of these transactions? You don't have to get this excited about this. I'm looking at your brief. There is no indication of what the lawsuit is about, the underlying lawsuit. The lawsuit is... I have the same problem. The lawsuit is that Mr. Knutson, after he drove off the lot, without having any contractual relationship with Sirius Radio, started getting marketing calls in violation of the TCPA. Well, no. Wait a minute. Let's stick with the facts. He didn't start getting these calls when he drove off the lot. After he drove off the lot. Yeah. He got them at the end of January. Right. Right. Okay. What were the content of the calls? Were they marketing calls? Yes. Trying to extend the contract, the Sirius contract? Well... What did they have to do with the contract? Well, that's my whole point, Your Honor. There was no contract with Mr. Knutson. Let's say there was a contract. What did they have to do with it? Well, I don't think they had anything to do with the contract at all. I think Sirius Radio was trying to make Mr. Knutson maybe buy a subscription for a year or so. They were marketing calls. So they were marketing-type calls that you say that were prohibited unless he consented to them under whichever telecommunications act you're relying on. And they're statutory claims. Yes, Your Honor. And you get so many, well, you get a thousand bucks without proving any damages or something like that. For negligent violations, he would get $500 a call. For willful violations, he would get $1,500. $1,500, right. Yes, Your Honor. So we go back to the point that when Mr. Knutson drove off the lot. And I would like to take a moment to see what was... Is there something about violating a $300? What are you talking about? You talk so fast, too. I'll slow down, Your Honor. You're not a salesman, are you? That's what I'm doing here, Your Honor. In a way. All right. So the moment that Mr. Knutson left the lot, was there a contract between Mr. Knutson and Sirius Radio? And the answer is no, if there was a contract. All right, well, let's assume that's true. There wasn't one then because he hadn't actually gotten... Or he hadn't gotten this document yet that said that if you don't cancel within three days, you... But eventually he did get that. Wait a minute. And I understood that the three days ran from the activation, so there might be some theory that he couldn't cancel it then. But the contract also said you can cancel it at any time and it will take effect at the next cycle. So pretty obviously what all this means is that the contract goes into effect if you don't cancel it within three days. But it then can be canceled as of the next activation date. And it's my understanding that if he had done that when he actually got the agreement, all of that was before his first... It would have been canceled before the first robocall occurred. That is all premised on one fundamental issue, which is one of formation. Because that is premised on taking Sirius' point of view. Let me ask you this question. Did the salesman tell him, all right, you're getting this service where you can call all these stations. And now you try it out. If you don't like it, try it out for a day or so or one day. If you don't like it, just call them up or call me up and I'll call them up and cancel it. Did anybody tell him that? No, Your Honor. Did anybody tell him about the 90 days? Yeah, he knew that he had a 90-day free subscription and that's what Toyota offered him. But they did tell him about a 90-day subscription. Right. The free subscription that Toyota was offering. I know that. Okay, so what did they tell him about it? I don't know. There's nothing in the record to say what was said or not said at the dealership. But what we do know is that he wasn't told about he can cancel within three days. That's certain. Oh, so you're telling me that nothing was said at the dealership? Apart from the fact that he's getting XM radio for 90 days, yes. I don't understand your answer. All right, so can you go back to my scenario and tell me why it was that even if he didn't have a contract, until he received this agreement and didn't move to cancel it, the fact is he didn't move to cancel it prospectively and nothing happened until after it could have been canceled had he tried to cancel it. And I think that's a fantastic question because it goes to the heart of this case, Your Honor. But it premised on formation. In order to have him canceled it, he would have had to have been a party to that contract. So we have to see whether a contract was formed the moment that welcome package arrived at Mr. Knutson's house and whether that offer was effectively communicated to him and whether he accepted before he was even bound in order to cancel it. Well, I mean, more fundamentally, though, as Mr. Preggerson has been pointing out, I mean, he did have not he knew he was getting the service for 90 days, so he thought he was getting it just with I understand he didn't have to pay for it, but that doesn't mean that there was he was getting a service, and so he was in some sense entering into an agreement. And that's exactly right. Why would Mr. Knutson accept an offer from Sirius Radio for something that he already had from Toyota? And I think if you look at the law on offering exceptions in California, especially an implied contract, because this would be an implied created contract because it's certainly not expressed and it's through conduct. So this package arrives and there's a contract in it amongst all these other materials and things that come from Sirius Radio. Why would Mr. Knutson even believe that there's a contract or reasonably believe that there's a contract for something that he already has from Toyota? And on top of that, that's something that Mr. Knutson knows that Sirius Radio knows that Toyota already gave to him. So it doesn't make sense that they have sent him an offer for something that he already has. But the logical extension of what you're saying is that even if the dealer had handed him a box with the contract in, moments after they activated the service, it wouldn't have mattered then either, right? Isn't that the logical extension of what you're saying? I would say it's a slight logical extension, but we're talking over 30 days later, Your Honor. And I think where we're going with this is the Bershoff line of thinking that Sirius briefed. And first of all, I'd like to say Bershoff is a district opinion, not binding on this Court. But the Bershoff rule, as it regards to acceptance, is the exception to the rule. The Ninth Circuit. Let's assume that, okay? Let's assume that, that until he had the contract, he wasn't bound by it. I'm arguing that when the contract arrived in the package, he wasn't bound by it because he never accepted it. Because what Sirius Radio is saying, Your Honor, is that because through his silence and his inaction, he accepted an offer. I don't even believe that that offer was effectively communicated because he had no reasonable expectation to believe that there's an offer in that package. But let's even say to overcome that hurdle. As far as acceptance is concerned, the Najib Court in this very Court said, Inaction and silence does not amount to acceptance in implied contracts unless, and then they created the exception, unless facts or circumstances or prior dealings reasonably would amount to assent or acceptance. So let's look at those exceptions. The exceptions in this case, you've got the facts or the circumstances. Did Mr. Knutson at any point contact Sirius Radio and say, hey, I would like your service? No, he didn't. He never communicated with them. The first time that there was any communication with Sirius Radio and Mr. Knutson was when the welcome package arrived. But that's like saying, because he failed to act, that justifies his failure to act. That's exactly what you're arguing by that. But the difference is, there was no prior dealing with him. Why would he expect to get an offer from somebody that he's never dealt with before? And especially for a buyer. Because it came from something, some outfit called Sirius, and he knew that he had a free subscription to Sirius that lasted for some time. So he's unnoticed that he needs to open this up and figure out what this is. But who gave him the free radio? It was Toyota, not Sirius, Your Honor. He already had the benefit. The benefit he was incurring had already been given to him by Toyota, not Sirius. So that's what I'm saying is, why was he unnoticed from Sirius? He'd never dealt with Sirius. So you're saying that he should open his mail from Toyota, but he should not open his mail from Sirius. I don't think there's a reasonable expectation for him to open that as one from Toyota, because he expected a bill from Toyota. He doesn't expect a bill from Sirius. It's free. He doesn't expect an offer from Sirius because he got it free from Toyota. Those are very distinct facts, Your Honor. So if you look at the facts of this case, from day one, from when he left the lot, all the way to when he received the package, there was never an offer and there was never an acceptance, and Mr. Knutson was never a party to any contract with Sirius Radio. So we should never get to Issue 2 in this case of unconscionability, because if he wasn't part of a contract, then the arbitration clause doesn't come into it. But let's even say they overcome that and we go to Issue 2. And Issue 2 is whether the arbitration clause within the contract was substantively unconscionable. And I put to you that it absolutely was. But in order to look at the substantive unconscionability, and though procedural unconscionability is not an issue before this court today, they have to be looked at together. And the lower court already found procedural unconscionability. And as this court said, and so is the Supreme Court of California in the Armandiris case, and this court said it in Davis' case against Melvin O'Meara, it's a balancing test. If you have a lot of procedural unconscionability, you don't need so much substantive unconscionability. And that's the case here. Now, substantively, you've got a party that can unilaterally change the arbitration clause at any time without fair notice. At any time, they can change the arbitration clause materially, or immaterially for that matter, and the only way that Mr. Newton or any other consumer could find out is by sitting next to a computer and pressing refresh, refresh, refresh. That's a huge burden to put on the consumer. Whereas if Mr. Newton wants to make any change, well, he can't make any changes to the arbitration clause, that's for sure. And if he wants to do anything, he has to give direct mail notice to Sirius. That is substantively unconscionable, Your Honor. Another thing that makes this contract substantively unconscionable, well, the arbitration clause substantively unconscionable, is the limited liability. You're saying unconscionable. You see, it's hard for me to follow you when you're moving around so fast and talking fast. Sorry, Your Honor. Would you like me to explain the unconscionability issue? No, no, just go ahead. Okay. But I want to go back to my original problem here, which is the arbitration clause presumably wouldn't apply if your client was driving down the street and a Sirius truck ran him over. Would it apply? I would say no. It's outside the scope. All right. So on what theory is your complaint? I mean, you're not arguing it, but I don't know why you're not arguing that this arbitration clause doesn't have anything to do with your contract, your complaint. That was my next point, Your Honor. I was briefed. Well, you haven't briefed, in fact. I thought in the reply brief we talked about the scope, Your Honor. Well, first of all, reply briefs don't do it if you haven't done it to begin with. Sure. But second of all, I did not understand that issue to be raised as such. Absolutely. And I agree with you. I think those telephone calls are completely outside the scope of the arbitration agreement. So I'd like to, if I probably don't have a way to – Could you show me where even in your reply brief you discussed this? I'm sorry, Your Honor? Could you show me where even in your reply brief you said this? I guess it's C-1. Is that it? Page 17? I believe so, Your Honor. What page are you – 17? Yes. 17 of the reply brief. What's on page 17? It's the scope of the arbitration agreement. Okay. It does not encompass the violations alleged in the underlying claim. Well, I got it. Well, but you're arguing that that makes it unconscionable. But you're not arguing – I mean, it doesn't actually say all disputes. That isn't actually what it says. It says – just a minute. What the contract says is any claim – let me see. Any dispute – no, that's not it. I'll have to find it later. But it didn't say all disputes. It said something less than that. Anyway, you haven't argued it. Go ahead. Thank you. Well, I'd like to save that for the rebuttal, if I may. Thank you. Now, tell me where there's a contract here. I will, Your Honor. Good morning, first of all. My name's Chad Hummel. I represent SiriusXM. Here's how this contract was formed. And it's consistent with all of the case law, including from the lower courts, which, of course, are not binding on this Court. No, it's not what I learned in law school. This is a different type of contract, Your Honor. It's a mass consumer subscription agreement that contains the terms of use of the SiriusXM service, which, as Your Honor said, is a satellite-based radio service that is either streamed to the Internet, to devices you can buy, or, as in this case, a radio that's in a truck that this particular consumer, Mr. Knutson, bought. In this case, the contract was formed, and the terms of the contract are reflected in the writing. How's the contract formed?  He goes in. He buys a truck. He's got a radio. And somebody tells him about XM Satellite. And he says, well, you got it for 90 days. Try it. If you don't like it, tell him you don't want it, and that's it. Don't even have to tell him you don't want it. When he buys the Toyota truck, he gets a 90-day free subscription. They have to activate the service. They call Sirius, and they say... Did he have a contract then? No. He had a contract when he received the terms of use in the mail. But why does he have a contract even then when he is not buying the service Toyota is for 90 days? He doesn't have a contract then. He has a contract when he receives the contract in the mail. He, in his own declaration, which is in the record, a lot of what we talked about in appellant's argument is not in the record. But what is in the record is he received it... Well, how would he know when he gets something in the mail that he has a contract? I get my mail and, you know, a bunch of stuff, and I just start throwing it away without even opening it. Right, Your Honor. And the cases that we cited stand for the proposition that reasonable consumers, competent adults are bound... Well, but the only thing is that what's very unusual about this situation is that his understanding is somebody else bought this for him. Somebody else has the contract, not me. That's not in the record. Why? Somebody else is paying for it for 90 days. What's in the record is he knew he had a 90-day free subscription, trial subscription. Right. He knew he received a welcome package from Sirius. Right. He knew, in the record, that he elected not to read it. This is from his declaration. But he didn't think he was buying anything from Sirius because it was already bought, and it was already paid for, and he wasn't doing anything. It's like somebody gave me a gift. If somebody gives me a gift and then I get a letter from, you know, Bloomingdale's, after I get a gift from Bloomingdale's, I'm supposed to open the letter from Bloomingdale's to find out whether Bloomingdale's thinks it's entering into a contract with me, even though I didn't buy anything from Bloomingdale's? It's not a gift. It is a service that he was accessing for 90 days without... But he didn't enter into the contract to buy it. He did enter into the contract when he continued to access the service. I'm sorry. I don't understand what you're saying. I know. I'll try to finish.  There is a contract under Bischoff, Lozano, Carnival Cruises, and other precedent. That's not a precedent. It's a district court case. It's a district court opinion. Okay. Fair enough. There is a contract, we would submit... All right. Do you have any case like this where somebody else is paying for the service and bought the service for them, and now they're being sent some contract, which is something that purports to be a contract with them, even though they didn't buy it? No. There is no case like that. No, there's no case like that. But what he did, he received the benefit of 800 channels for 90 days. And when he receives the contract, he elects not to read it. We know that. And he continues, even though the contract itself says you should call to cancel, and you can cancel at any time, he continues to receive the benefit of the service through February 7th. Sure, because it's already paid for, and somebody gave him a present. Correct. But in exchange for that present, which is not a present. It's a commercial relationship when you're accessing the serious channel services. In exchange for that, he's bound by certain things. One of the things he's bound by is an arbitration provision. All right. Now, let me ask you this. First, you have to have the contract. Can you tell me how this arbitration provision covers this dispute? Absolutely, Your Honor. Under the — I apologize for my glasses. Under the first paragraph under Roman I, Resolving Disputes, the arbitration provision covers any legal or equitable claim relating to the service, the site, or your subscription. Where are you reading from? All right. Now, there's nothing in the complaint, at least, that says that it relates to the service, the site, or the subscription. No, that was essentially conceded. The calls relate to this. When you get the 90-day free trial — When it's conceded. It's not in the complaint. No, it was never argued in the district court. And we're operating on the complaint. Well, let me find it. What page are you looking at? I'm looking at, Your Honor, it's in the record 32, in the excerpts of record. But you're right. It's not in the complaint. But it's a — what is in the complaint is that these were calls that violated the TCPA. All right. Which are these robo-dialed calls. Which I could — if Sirius started calling — I mean, I happen to have a Sirius radio. But if I didn't have a Sirius radio and Sirius started calling me, certainly that — which they could do. I get plenty of calls from people with whom I have absolutely no relationship. I would still have the same complaint and the same problem, right? He had a relationship with Sirius. He was receiving the service. And the calls relate to, in this circumstance — and, again, it's not in the record, but it was never contested in the court below — is, nor is it in the complaint. Well, how could the district court say that the arbitration clause applies if there's nothing in the record to show it applies? Because the calls unquestionably relate to his trial subscription. What the calls do, Your Honor, is they say, if you don't call up and pay for a subscription, you're going to lose your service. That's what the call's about. And his service was about to terminate February 7th. The calls come in in late January. Three calls. But who's going to listen to those robo-calls? I don't even answer my phone anymore because if I'm at home for an hour, I'll get three of those calls. Well, the TCPA is designed to prevent that. They don't even know how to pronounce my name. The question is not here yet. One guy called me up and said, may I speak to Mr. Pragerson? I said, oh, I'm sorry to tell you, he died last month. And the guy said, well, may I speak to his widow? The issue here, Your Honor, is not whether these calls violate the TCPA or not. Tell me how there can be mutual consent if the record indicates from his declaration that he was given this free subscription for 90 days. And in order to have this relationship, I don't understand how it was formed. He received something in the mail. What is there that puts him on an obligation to open that and to read it and to be unnoticed? At least somebody thinks he's under contract. He knows that he has a trial subscription period. Exactly. Paid for, finished. Why does he think there's anything else to do about it? If he's going to just lose the subscription, he absolutely, Your Honor, can have it terminated without doing anything else. However, if a dispute arises, for example, a TCPA dispute relating to his subscription, his failure to open that envelope and read the terms creates a contract. What authority is there for that? Just those district court cases? Yes, Your Honor. But those district court cases do not deal, even the district court cases, do not deal with a situation where he did not enter into an, he didn't buy anything from Sirius or purport to. Your Honor, there are three ways you can subscribe to Sirius, basically. You can go on the Internet and sign up. You can buy a device, which is a SiriusXM radio you can carry around, or you buy a car. When you buy a car, we all know, and it has SiriusXM. I don't know how Your Honor has Sirius. You are told at the dealership, this is a free trial. You're going to have to call to get the permanent subscription. Okay. But he didn't want the permanent subscription. At that moment, you have a relationship. Does this case have anything to do with the permanent subscription or are we dealing with a 90-day period? I couldn't hear you. Are we dealing only with the 90-day period in this case? Yes. Right. So what's the difference? What would have happened after that? For the 90-day period, the contract, as far as he was concerned, was with Toyota, not with him. That's not in the record. He knew he had a relationship with Sirius. What's in the declaration, his own declaration, is he knew he had a free trial period with Sirius. He knew he received a welcome packet. He knew he deliberately made a choice. Ordinarily, one thinks that if you want to get service from somebody, you have to pay him. But he knew if you want to enter into a contract. But he wasn't paying him. He wasn't paying him, but he was receiving the benefit. He elected not to read the terms of service. And these types of service agreements apply in almost every industry. You're right, Your Honor. There is one nuance here that doesn't exist in the other cases. And that is he entered into a purchase agreement with Toyota, which had an arrangement with Sirius. And that is a distinction without a difference, I would submit. Why? Why does it have no difference? When you're driving around in your Toyota, when you access a paid subscription service, even during the trial period, you know you're receiving a benefit from Sirius. No, I'm receiving a benefit from Toyota, who made a deal with Sirius to give me a benefit. But would you concede, Your Honor, as I would argue, that he is receiving the benefit of the satellite service? Right, but not from Sirius. So you may have some consideration, but you don't have mutual assent. You have implied assent under the law. And, again, I have not found that certainly there's no Ninth Circuit case. And there's no circuit court opinion that talks about implied assent in this situation. But this is the way. And one thing that the cases do talk about is you look at the economic realities of how consumers sign up for services. And this is one way to do it. Now, there is absolutely no harm to this particular case. He didn't individually sign up for the service, and he was never required to. Is that correct? No. He absolutely signed up for the service. The minute he used the service and had it activated by Toyota. You gave us three ways that you could have a relationship with Sirius. Right. Two out of the three requires the subscriber to initiate contact. The third does not. It seems to me that you have to show us something more if he utilized, if he had service as a result of not initiating it himself. If it comes as part of the car, you do have to activate the radio. Well, you turn it on. No. You have to contact Sirius XM and match the receiver. But Toyota did that. We don't know that. We don't know that. We don't know that it did. We don't know that it did or didn't. We presume, by the way. You're not relying on, you are not contending that he entered into the contract by himself activating the service. Correct. We are contending that. We have to assume he didn't do that because you're not claiming that he did do it. I don't, well, if you're asking me a hypothetical question. No, we're asking you what's in the record. Does the record indicate that he affirmatively did anything similar or dissimilar to the two other ways to initiate a contract? Did he do anything in this third category to initiate an agreement with Sirius? Use the service. He received the terms and conditions. Okay. By using it, there's no information in the record that he called Sirius and said start the pre-subscription, right? Correct. All right. So he uses it by getting in this car, a truck that he bought from Toyota and turning on the radio. Correct. I thought the record demonstrated that it may have been activated even before he bought it. There's no indication. I thought there was some indication. Well, the only indication is based on the timeline where it looks like it was activated on the 7th of November and he bought the truck on the 11th. Right. So there is an indication. So why are you telling me there's no indication? You think I was making it up? I'm not making it up. You think I was making it up. I asked you a question for a reason. I had something in mind. No, no. There is some discrepancy in the dates. But, Your Honor, yes, he and the cases talk about continuing to receive the benefit after you've had an opportunity to review the terms and conditions, which in this case include the written agreement and an arbitration provision. And he receives these calls, which clearly relate to his experience. Would you at least agree that if we were to find that this was an agreement, it would be the most attenuated situation that you've ever seen in a case? No. Give me another one. No. I would agree that there are millions of subscribers daily and companies daily, including in the satellite service industry, in the radio industry, in the television industry, in the cell phone, provision of cell phones, in telemarketing, where all the time consumers receive terms and conditions after they have signed up with the company. Your Honor, there is no question that this person used the service. And there's no question he knew it wasn't FM or AM radio, that it wasn't going to be free forever. Does the declaration indicate that when he turned on his radio and he hit the button to listen to Sirius, that he knew that he was getting something that otherwise doesn't come with the car? Like a little strip. If you touch this button, that indicates you're set.  There's nothing like that. If anything, the record indicates that the service was turned on before he even bought the car. It certainly doesn't have to be. Only the dates. What does only the dates mean? It shows that it was activated before he bought the car. But he used it when he bought the car. And he certainly was aware that he got the 90-day subscription. It says that in the record. And he did receive the terms of use. And he chose not to read them. I can't say any more than that. What if I get a package at home. There's a book in there. And I know there's a book in there. And I know I didn't order the book. But there's a statement that comes with the book that tells me that I have 30 days to return the book. And if I don't, I bought it. Is that a contract? That's a so-called negative option agreement. It's a marketing scheme. Most of those are now illegal. But this is not a negative option. But the big book companies are using it all the time. This is not that situation. This is not a situation where if he did nothing, the subscription would be here on another issue. The problem overall is that a burden is put on the consumer. And there's an implication that the consumer, by doing nothing, is entering into a contract and is consenting. And there's a lot of authority that that's perfectly okay. In other words, if I call up Comcast and say, Comcast, I'd like some Comcast service. And they say, fine, we'll start your Comcast service. And then they send me some piece of paper that has a contract. Correct. That's one thing. Because I have, in fact, made a contract with Comcast because I called up Comcast and said, start the service. Right? He didn't do that. He did the exact equivalent by buying the Toyota truck and utilizing the service, which is not in any way disputed here. Most people would think if they have no obligation to pay for it, which he didn't. He had no obligation. That they were not in a contractual obligation, but serious. The only burden associated with this particular contract is that there's an arbitration provision in the consumer agreement. And let's take your hypothetical, Your Honor, where let's say at the time of the dealership, which, by the way, there's some case law discussion that says consumers can't be expected to listen and you can't. In fact, Judge Easterbrook in the Seventh Circuit wrote a long decision about it. You can't expect car salesmen or salesmen in these industries to read through every provision of the terms of service. But take your hypothetical. Let's assume the contract was in the glove box at the time that he served. Totally hypothetical. Didn't happen here. Would you have a different view about whether a contract was formed if the salesman, by the way, said you're activated, the terms of use are in the glove box, read them or not, but in 90 days you're off the service? Is that different? I think not. How is it not different? Because it's the same situation exactly. He didn't activate it. No, no, but the salesman has told him, according to your hypothetical, you, sir, have a relationship with Sirius. In this case, there is nothing that tells him you, sir, have a relationship with Sirius. Yes, there is, Your Honor. Where? The welcome package, which he received. He gets a welcome package. Am I obligated to open everything that comes to my house? No, but if it's from SiriusXM, it says welcome to our service. But nobody told me, like in your hypothetical, you, sir, have a relationship with this person. And then I receive in the mail something from that person. I would submit, Your Honor, you know when you buy a car that you have a 90-day trial subscription to satellite radio. That's on the sticker in the car. It's part of what you're buying. Yes, of course you do. But what you think or what I would think is the person who has the relationship with Sirius is Toyota. Yeah. How much does Toyota get every time that's activated? I don't know. You've got to know the idea. I don't. I know your idea. I don't know the answer. Is the sticker you talk about, is the sticker in the record? No. The Marconi disclosures are not in the record. No. What's in the record are the facts from his declaration, and it's undisputed, Your Honor. Is there a sticker with that on? The satellite radio, the trial subscription is invariably on the sticker on the car. What does it say? In this record, I don't know. No, no. What does it say generally? It says it on the sticker. It includes a trial period of SiriusXM. Right, right. It does. It does. It's included. Exactly. It's included. I've never seen it. I'm giving it to you, and I've made a deal with Sirius to give it to you. I'm not you. I have a relationship with Sirius. What's the objection? What is the substantive objection? I can't think of one. To receiving the contract in the mail. Maybe you look the other way. How difficult is it to fix this? Now, I know you have wholly different problems here. You've got a class, and you have statutory damages, and you want to avoid those. But if this is easily fixed, then I'm not sure we should worry about that. The easy fix is the deal between Sirius and Toyota requires a checkoff for the salesman. And the salesman must say, you, sir, when you drive off this lot, have a relationship with Sirius. And you're going to get a package in the mail. Please open it and look at it, because that's your contract. That's a simple fix, isn't it? No. Why? It could be extremely expensive, time-consuming. Well, this is going to be pretty expensive if it gets reversed. Assuming, of course, that the underlying TCPA violation is covered. You sit back there quietly. Of course. Separate so you're not, well, you can assemble. The question for the court is whether this particular person, Mr. Knutson, was bound under these circumstances to this arbitration provision as a result of implied assent. Right. That's it. That's the issue for you to decide. And there is no controlling Ninth Circuit authority on point. I will submit, Your Honors, that you should look at the commercial realities of selling to mass consumers, and there is nothing wrong with sending terms and conditions afterwards. It's done in every consumer-facing industry. You sign up for an app on your iPhone, and you get the terms and conditions afterwards. Absolutely. I myself voluntarily pick it up, and I go to the app to select it, the app app, and I pick an app, and I do that all myself. Not necessarily. You buy an Android phone, there are preloaded apps. And the shrink-wrap terms and conditions come later. So this is exactly analogous to the preloaded app. This is different than a shrink-wrap case, though. Pardon me? This is different than a shrink-wrap case. It is. Okay. But you're hinging the decision, or at least the questioning about the decision, on where the relationship lies. And I submit there's a relationship the minute he uses the service, and that's what, again, the district court cases say. I can see that. No, there is no district court. We already agree there is no case like this. There's no case quite like this, but they're all similar. You go to the AT&T store, you buy a phone, you get the terms and conditions either at the time or mailed to you by Apple, or emailed to you by Apple when you bought an iPhone. But you pay for it. You bought it and you're paying for it. You bought the phone. You didn't buy a lot of the iTunes store services. You didn't buy a lot of the other stuff. They don't charge you for that. Certainly there are apps that are extra. Not preloaded ones. Preloaded ones are all free, aren't they? Not always. No, there are subscription services for preloaded apps. I'll watch that next time I get a phone. Do that. Absolutely. No, but here's the thing. He's receiving the benefit of the service, and he continues to do that. And during the time, which, by the way, he would be charged. Take away the Toyota-Sirius relationship for a moment. Assuming it entered into a relationship with Sirius, which I can contend, no question he knew that that's what he had. When he receives the terms and conditions, he's charged with knowing them. And when he continues to receive the benefit, he's subject to an arbitration provision. And there is nothing, Your Honors, you haven't even reached the question, because I think the answer is obvious. There's nothing unconscionable about this arbitration provision. It's absolutely bilateral. It's absolutely different from the Kilgore situation, Your Honor, which you addressed in your dissent in that case. There's no fee-shifting provision. There's nothing unfair. There's no statutory remedy that he's denied. The only issue is class. Can he be a class representative? And that issue is precluded under Concepcion. One more time, just because I'm having trouble finding it. The actual coverage provision is on 32. This is under Section I. It's under Section I. Is CAP language? Yeah. Resolving disputes. Resolving disputes. And then there is, there's CAP language and then, I'm sorry, and then right underneath there is in order to expedite. I have, like, pages 6 of 9. There it is. It's on page 9. Okay. Resolving disputes. Go ahead. Who can read that? I just made it bigger. So can you just read to me what the language is? Yeah. Sure. It says, please read this provision. Carefully. This is unfortunately a copy of a pamphlet. Right. Go ahead. The language is underneath the CAP section, Your Honor. Yes. It reads, in order to expedite and control the cost of disputes. Right. I see that. But I want to know what the coverage is. You agree that any legal or equitable claim relating to the service, the site, or your subscription. Service, the site, or your subscription, or this agreement. That's what you're relying on. This is in the first paragraph. It's the first paragraph under the CAPs, under resolving disputes. Okay. It's the second paragraph under resolving disputes. And this relates to the service, the site, the subscription, or the agreement. Oh, I see. Okay. Do you see what I'm saying? Yeah. It relates to the subscription. Because they call up and they say, if you don't do anything, you're not going to have a subscription? Correct. So if you don't have a subscription, then it relates to your subscription? You have a subscription under, if you look at page one. Yeah. All right. Subscription includes trial sanctions. I see what you're saying. Okay. Why are these. Thank you. Where does it say you have a subscription? In the very first paragraph of the agreement, it says, thank you for choosing to become a subscriber, and this covers trial or other subscription. Let me ask you. You are a subscriber when you receive the trial. In the very first paragraph of the agreement. Paragraph of the subscription. Page one. Right here. I think it's. No, it's just on the other side. Well, if there were an issue about whether there was coverage, and I understand it was probably that range, would that go to the court or the arbitrator? It says, please read the terms of this agreement carefully. This is a question for the court, Your Honor. It's a question for the court. Of course. The two prong tests are, is there a valid agreement, and does the arbitration provision cover this particular dispute? That's for the court. I don't think we're there yet, but it seems to be pretty dubious. Who's going to read all this stuff? The question of whether you're getting telephone calls about a future subscription. You read it? I read it for the case. That's a different matter. What I think Judge Prejean was getting is, what in that second paragraph indicates that the unwanted telephone calls are within the scope of this arbitration agreement? Because the call relates to the subscription. Now, that, Your Honor, is interesting. Where is that now? Well, it relates to extension. You have a subscription, and you get a call that says you have to do something or you're going to get canceled. That's what the calls are about. Is that in here? No. That's not in the record on appeal. So the telephone call, according to what you're saying, was essentially an effort to remind him that he needs to refer to the cancellation provision in G. Well, no. He needs to pay. He needs to sign up to have a paid subscription for a one, two, or three-year term. But this is not jiffy. Let me mention this to you. I go buy a car from Toyota, and they have this device that you can put on your car so it can be tracked. So if it's stolen, they know where it is. Yeah. I forget what that's called. I forget what it's called, too. But when you sit down and you're filling out the papers, they ask you, would you like to subscribe to the service? Lojack. Yeah, Lojack. Lojack. Yes, not a good name. Sounds like you're being hijacked. That is not. But the closer asks if you would like to subscribe to that, and he discusses the benefits and all that. It's so many dollars a month. And I always say, no, I don't need that. And now if I bought a car, and there was a Lojack on there, and I didn't ask for it, am I bound to pay Lojack in a monthly fee? No. Why not? You didn't elect to receive the service, which was a paid service right up front. You wouldn't be bound. If you affirmatively declined, here's a situation where he's affirmatively accepting the benefit of a free trial period for three months. And the only issue is, is he bound by the terms and conditions of service, including the arbitration? If I say, okay, let's say we're talking about the Lojack. The guy, the sales, and the closer says to me, you know, we have this device called Lojack. If you lose your car, or if you lose yourself, if they want to know where you are, we can find you. And now we're going to give you a trial for three months, and see if you like it. If you don't come back again at the end of three months, you've bought it. Again, that's a negative option, which is not what we have here. A negative option is if you do nothing, you're automatically enrolled, you automatically have to pay. That's not this case. There's no doubt that all that would happen on February 7th. Well, yeah, in a way, this is a negative option. If you don't do something, you're stuck with this arbitration clause. If you don't activate the cancellation. No, that's one of the burdens of receiving a free service for 90 days, is you submit to arbitration. After you receive the agreement, and are on notice of the terms and conditions, and you continue to accept the benefits. He could have read the agreement, called up and said, I don't want this, I don't want to arbitrate my claims. And by the way, if you call me, I'm going to sue you. I'm going to find some lawyers, and I'm going to sue you under the TCPA as a class rep. I've so far exceeded my time. It's maybe the record. But I'm happy to answer any other questions. Your Honor, thank you so much for your time. I appreciate it. Thank you. Are you hustling class actions? I'm sorry, Your Honor? Are you hustling class actions? I wouldn't use necessarily the word hustling. Well, whatever word you want. We do class actions, yes, Your Honor. What did you say? Yes, I practice. I do a lot of class actions, yes. So you're a class action lawyer? Yes, Your Honor. Okay. All right. You, of course, want to admit to that. Thank you for your time, for allowing me to rebut just a couple of points. Just the fact that I just want to go over what counsel just said regarding incurring the benefit. I don't want you to think I'm against class action. I'm not. I appreciate that, Your Honor. Thank you. I don't like arbitration clauses either. Anyway, go ahead. Thank you. As far as incurring a benefit. Because you can't read all the print. That's very true, Your Honor. With getting the benefit, as I explained earlier, Mr. Newton already had a benefit from Toyota. I think we understand all that. Okay. And the last thing I would just like to say, Your Honor, is there is some case law on the assent. And I direct the court to the Circuit City v. Najib case, which came out of. . . Which one? The Circuit City v. Najib, which is a Ninth Circuit case. It is. . . You cite it? Yes, Your Honor. If you'll give me one second. I'm not hearing the name of the case that you're relying on. Could you spell it because I'm not hearing what you're saying? Yes, Your Honor. Is this the recent case that you're talking about? It's not that recent, no. Are you looking in your library for your. . . I'm just looking at my notes right now. Oh. Give us a tip. What's the name of the case we're looking at? Oh, it's Circuit City v. Najib. N-A-J-I-B. Ninjib? Yeah, I have the. . . It's a 2002 case. It's 294F3-1104. What's that again? 294F3-. . . 294F. . . 3-D. . . 3-D. . . 1104. 1104, and that's Ninjib. Circuit City Stores v. Najib. N-A-J-D, I'm sorry. There's no I in it. N-A-J-D. Najd. And what that. . . One of the holdings in that case, Your Honor, is. . . It says that silence and inaction do not amount to acceptance. That is the general rule of the. . . Oh, that's been the rule for a long time, so there's nothing new about that. Well, I think it's very important because Sirius is. . . Well, I didn't say it was not important. It's a rule. It's been there. I was just giving you the case. And I think the only other cases that I would like to direct the court to is a California pellet case called Winslow and a Second Circuit case called Schnabel. And what they're saying is acceptance by. . . Impliedly can only be done if the reasonable, prudent person understood or reasonably should have understood that there is an offer being portrayed. And I think as we've discussed at length by both sides is that. . . And I think the key issue here is did Mr. Newton. . . Did he know or should he have known that there was an offer in that marketing package? And I contend to you, Your Honor, that he absolutely had no duty to look in there and he shouldn't have known. And so, in conclusion, I ask the court and I implore the court to reverse the decision and state that there was no valid contract between Mr. Newton and Sirius Radio. Thank you so much for your consideration and your time. Well, is that. . . Well, forget it. Okay. All right, the court. . . This is the end of a long week. We've had 30 appeals that we've considered and we will recess. Thank you.
judges: Pregerson, Murphy, Berzon